## THE PEOPLE OF UTAH TERRITORY, RESPONDENT, v. B. Y. HAMPTON, APPELLANT.

CRIMINAL LAW—CHALLENGE TO PANEL—MEMBERS OF A CHURCH EXCLUDED.—A defendant in a criminal action has no absolute right to a trial before a jury partly composed of members of the church to which he belongs, and a challenge interposed to the panel of jurors on the ground that the members of such church had been' purposely excluded in the selection thereof, it appearing that such exclusion was because the officer selecting the same deemed that they would not be impartial jurors, is properly overruled.

ID.—HOUSE OF ILL-FAME.—A house of ill-fame is a house kept for the convenience and shelter of persons desiring unlawful sexual intercourse, and in which such intercourse is practiced.

ID.—INSTRUCTIONS—REDUNDENCY.—It is the duty of the court, when requested, to instruct the jury upon every point of law pertinent to the issues, but when the charge of the court covers the entire case, such court may refuse to instruct further.

ID.—CONSPIRACY—EVIDENCE.—The defendant was charged with conspiring with a woman to keep a house of ill-fame, and evidence tending to prove the conspiracy having been given; held, that evidence of notes sent by the woman and statements made by her in furtherance of the common design was admissible against the defendant.

ID.—ID.—EVIDENCE.—Evidence having been given tending to prove that the object of the conspiracy charged was to inveigle prominent men into a disreputable house, in order to blacken their characters, and the defendant having testified in his own behalf that his only motive was to detect and punish sexual crimes; held, that the prosecution on cross-examination could properly show that, about the same time he had paid another woman a large sum of money, and had sent several hundred dollars to have a prostitute come from San Francisco to Salt Lake for the purpose of detecting some one, as tending to throw light upon defendant's good faith in the transaction.

ID.—CONSPIRACY—INDICTMENT FOR.—An indictment charging the defendant with entering into a conspiracy with one Mrs. S. J. Field to keep a house of ill-fame, and that between the 20th day of June, 1885, and the ⌐1st day of October, 1885, the said Field, in pursuance of said conspiracy, did keep such house; sufficiently charges a public offense.

APPEAL from a judgment of the district court of the third district, and from an order refusing a new trial. The opinion states the facts.

*Messrs. Hoge & Burmester,* and *Sheeks & Rawlins,* for the appellant.

The challenge to the panel should have been sustained: Thomas' Coke, vol. 3, 509, 510; Proffatt on Jury Trials, secs. 150, 151, 152; Thomson & Merriam on Juries, secs. 130, 131, 140; *Munshower* v. *Patton,* 10 Serg. & R. 334; *Wood* v. *Rowan,* 5 John. 133; *Gordon* v. *Turner,* 9 John. 260; *Pringle* v. *Huse,* 1 Cowen, 132 and note; *Van Auken* v. *Beemer,* 4 N. J. L. 364; Cooley's Const. Lim., chap. 13; *Strauder* v. *West Virginia,* 100 U. S. 303; *Virginia* v. *Rives,* 100 U. S., 313; *Ex Parte Virginia,* 100 U. S., 339.

The indictment is insufficient. The facts stated do not constitute the offense sought to be charged, or any offense against this defendant: Comp. Laws, p. 584, sec. 1916; Laws of 1878, p. 117, sec. 267; Laws of 1878, p. 92, secs. 150 and 151; see also 9th Cowan, p. 577, *Lambert* v. *The People;* 13th Iowa, p. 269, *State* v. *Jones;* 5th Barr., p. 60, *Hartman* v. *Commonwealth;* 4th Crim. Law Mag., p. 891, *U. S.* v. *Walson;* 3d Wharton Cr. Law, sec. 2305; 4th Met., p. 111, *Commonwealth* v. *Hunt.*

The court charged the jury "that a house of ill-fame is a house kept for the convenience and shelter of persons desiring unlawful sexual intercourse and in which such intercourse is practiced."

This instruction is erroneous and misleading: *Cadwell* v. *The State,* 17 Conn. 467; *State* v. *Blakesley,* 38 Conn. 523; *Commonwealth* v. *Lambert,* 12 Allen, 177; *O'Brian* v. *The People,* 28 Mich. 213; *State* v. *Hand,* 7 Iowa, 411.

*Mr. C. S. Varian,* for the respondent.

POWERS, J.:

A peculiar state of facts is shown by the record in this case. It would seem that lewd women were employed to open houses of ill-fame in the city of Salt Lake. It is claimed that men who had not sufficient self-respect or morality to resist such allurements were beguiled therein, and that the unholy practices with the women were

watched from adjoining apartments through peep-holes
by members of the police force. It is insisted that this
was done in the interest of virtue and morality. The de-
fendant, Brigham Y. Hampton, is a prominent member of
the Church of Jesus Christ of Latter-Day Saints, com-
monly known as the Mormon Church, and this fact be-
comes material in considering the objection to the panel
of jurors hereafter referred to. He has held many posi-
tions of trust in Salt Lake City, and at the time of his
conviction he was the collector of license of that city,
and was also a member of the police force. In the spring
of 1885 he, or some one connected with him, conceived the
idea of employing prostitutes to do what he, in his testi-
mony, terms "detective work." He states that he had ob-
served that there were a great many street-walkers in his
city, and that many young girls were being lead from the
path of virtue. He seems to have consecrated himself to
a great work. He proposed to put an end to houses of
ill-fame and prostitution, and he went about this work by
immediately opening more houses. He hired his own
prostitutes, he opened his own houses, and from points of
vantage he and his co-laborers began a study of the bestial
practices that occurred within the dens of infamy which he
had established.

He does not appear to have been the only one concerned
in this transaction, but he and a man named Salmon seem
to have been the moving spirits. We shall not deal with
any more of the details than we are compelled to do in
determining the case; but this does not and should not
prevent us from expressing our disapproval of the conduct
of the defendant, or from condemning, as the highest court
of this territory should condemn, the wicked and disgrace-
ful conspiracy disclosed.

I. The defendant challenged the panel of jurors sum-
moned for the term by the United States marshal upon
an open venire. It was claimed that the marshal was
biased and prejudiced against the defendant, and had
formed and expressed an unqualified opinion that the de-
fendant was guilty. It was also claimed that the marshal
intentionally omitted to summon any person as a juror who

was a member of the Mormon Church. To sustain this challenge, the only witness called by the defendant was the marshal himself. He stated that the panel was the regular panel summoned for the term; that he did not have any bias against the defendant, and that he did not select men whom he thought would convict. He stated that he aimed to secure impartial jurors, and that he did not select Mormons because he thought they would not be impartial. That he selected a class of men whom he had reason to believe would be fair and just. He stated that he had not talked with any of the jurors; that he did not personally summon them, but that he prepared the list. He also said that he had no aim except to secure proper men.

We think the challenge was properly overruled. The officer, by his testimony, does not appear to have been biased, and even if he had been, the men returned were unobjectionable and possessed the statutory qualifications. Suppose an officer, who was a member of the Methodist church, in summoning a jury to try a Presbyterian, should purposely omit to summon any Presbyterian, would that be a ground for challenge? The defendant is entitled to a jury of qualified and impartial men. He cannot claim, as a matter of right, anything more. He cannot insist that men of his religious or political faith be upon the jury. It was said in the case of *People* v. *Jewett*, 3 Wend. 320, that "whilst those who are selected are unexceptionable, the fact that others, equally unexceptionable, are excluded, is no cause of challenge to the array." No such bias, or partiality, or improper conduct upon the part of the officer was shown that would justify us in setting aside the verdict for the cause alleged.

It was said in *Virginia* v. *Rives*, 100 U. S., 322, that "it is a right to which every colored man is entitled, that in the selection of jurors to pass upon his life, liberty, or property, there shall be no exclusion of his race, and no discrimination against them because of their color. But this is a different thing from the right which, it is asserted, was denied to the petitioners in the state court, viz., a right to have the jury composed in part of colored men. A mixed

jury in a particular case is not essential to the equal protection of the laws."

And, again, on page 355 of the same case, it is said that "from the return of the district judge it would seem that in his judgment the presence of persons of the colored race on the jury is essential to secure to them the 'equal protection of the laws,' but how this conclusion is reached is not apparent, except upon the general theory that such protection can only be afforded to parties when persons of the class to which they belong are all allowed to sit on their juries. The correctness of this theory is contradicted by every day's experience. Women are not allowed to sit on juries; are they thereby denied the equal protection of the laws? Foreigners resident in the country are not permitted to act as jurors, yet no one will pretend that they do not enjoy the protection of the law."

We have cited the above as illustrating our view that a man on trial cannot claim, as a matter of right, that men of his color or of his faith be upon the jury which tries him. Of course, an officer summoning a jury should not exclude men merely because they are of the same faith as the defendant: Ex parte Virginia, 100 U. S. 348. But that question does not arise in this case. The officer omitted to summon Mormons, he states in his testimony, because they would not be impartial. They were omitted, not because they were Mormons, but because they were partial. This was clearly within the discretion of the marshal. When an officer is required to summon a jury upon an open venire, it rests largely in his discretion as to what men shall be summoned. So long as he does not abuse that discretion, but selects men who meet the requirements of the statute, the defendant has no cause for complaint. In the case at bar no jury who had any regard for their oaths could have found any other verdict than guilty.

II. The court charged the jury that "a house of ill-fame is a house kept for the convenience and shelter of persons desiring unlawful sexual intercourse, and in which such intercourse is practiced." It is argued that this instruction is erroneous and misleading. We are of the contrary opinion. The defendant, in his testimony, denied ever

making any agreement with the woman with whom, it is alleged, he conspired to open a house of ill-fame. His testimony was to the effect that the woman had already opened a house of prostitution when he first met her, and that he simply employed her to do some detective work. That is, he was to pay her twenty-five dollars for every affidavit she would make charging men with having visited her house. The defendant himself made affidavits setting forth the fact that the house was a house of ill-fame, and caused arrests for visiting the place for lewd purposes. The fact that the house was a house of ill-fame was not seriously disputed on the trial. The defense alleged that whatever the defendant did was done with an honest intention to detect and punish crime, and the court charged the jury in connection with the extract just quoted that if the jury believed "the defendant only intended to detect and punish crime," then he must be found not guilty. Under such a state of facts and with the charge as indicated, it cannot be said that the charge was erroneous or misleading.

Moreover, we think that the charge was correct as a matter of law. A house of ill-fame, in criminal law, is a house resorted to for the purpose of prostitution and lewdness: 5 Ired. L. 603; Bouvier's Law Dict. 672. If a lodger lets her room for the purpose of indiscriminate prostitution, she is guilty of keeping a house of ill-fame, as much as if she was proprietor of the whole house: *Regina* v. *Peirson*, 2 Ld. Raym. 1197. The house need not be kept for lucre to constitute the offense: *State* v. *Bailey*, 21 N. H. 345; *Commonwealth* v. *Ashley*, 2 Gray, 357; 18 Vt. 70. Why was not the court right, therefore, in saying that it is "a house kept for the convenience and shelter of persons desiring unlawful sexual intercourse, and in which such intercourse is practiced?

III. We think the court in its charge fairly submitted the case to the jury, and in refusing the requests of the defendant that there was no error. We are aware that it is the duty of the judge, when requested, to instruct the jury upon every point of law pertinent to the issues: *People* v. *Taylor*, 36 Cal. 255; *Hays* v. *Paul*, 51 Pa. St. 134; *State* v. *Willson*, 2 Scam. 225; *Davis* v. *State*, 10

Ga., 101; Laws 1884, p. 125, sec. 30; and that a party has the right to have the jury instructed upon the law of the case clearly and pointedly, so as to leave no reasonable ground for misapprehension or mistake, and that it is error to refuse to instruct, when requested, upon points pertinent to the issue: *Muldowney v. Illinois Cent. R. R. Co.*, 32 Iowa, 176; *Carpenter* v. *State*, 43 Ind. 371; *Morris* v. *Platt*, 32 Conn. 75; *Nels* v. *State*, 2 Tex. 280. But if the court sufficiently charges the jury on the point which the request covers, though not in the language requested, it is not error. The court may use its own language, and when the charge given by the court covers the entire case, such court may refuse to instruct further. Neither party has the right to ask anything more: *Laber* v. *Cooper*, 7 Wall. 565; *Indiana R. R. Co.* v. *Horst*, 93 U. S. 295. We have, therefore, simply had to determine whether the charge of the court fairly covered the whole case, and sufficiently instructed the jury upon the points presented by the defendant. As we have stated, we think he did. The court uses fewer words than are contained in the instructions asked, but that fact does not detract from the clearness of the charge.

1. The court was requested to charge that the jury could not convict upon the testimony of an accomplice unless such testimony was corroborated. This was done.

2. The court was requested to charge that the offense charged is not the keeping of a house of ill-fame, but a conspiracy to do so, and that testimony corroborating an accomplice must be testimony corroborating the testimony tending to prove a conspiracy. The court, as we have seen, charged that the testimony of an accomplice, uncorroborated, was insufficient to convict. The court also stated clearly the offense charged in the indictment, and informed the jury that they must be satisfied, beyond a reasonable doubt, that the particular offense charged had been committed before they could convict.

3. Another instruction asked was to the effect that if the defendant, on his own account, or with persons not named, concluded to open a house of ill-fame, and simply employed the woman Field, then the defendant was not

guilty. The jury were, we think, fairly instructed upon this point.

4. The fourth instruction was, it seems to us, misleading, and therefore properly refused. Nevertheless, taking the charge as a whole, it seems to cover the principle requested. The same criticism applies to the fifth instruction.

5. The sixth instruction was to the effect that the jury must find that defendant and the woman Field agreed to a common unlawful purpose, and that if the purpose of the defendant was simply to detect and punish offenders against the law, the verdict must be not guilty. This request was fully covered by the charge.

6. The seventh instruction is to the effect that there is no question of any general scheme, or of any scheme or conspiracy of any kind under consideration in this case, except the particular one charged. While the court did not give this instruction, it nevertheless carefully drew the attention of the jury to the charge against the defendant, explained the offense, and told the jury that they must be satisfied beyond a reasonable doubt that the offense charged had been committed before they could find a verdict of guilty. We have been unable to detect any errors in the charge, or refusal to charge. Taking the charge as a whole, it fairly and fully presented the case, and we do not think that the jury was misled by anything in the charge, or by any refusals to charge.

IV. The woman with whom the defendant conspired to keep a house of ill-fame sent notes to prominent Gentiles of Salt Lake, asking them to call upon her. The woman swears that she was to receive three hundred dollars if she would compromise the governor. One of the notes sent by the woman, and her conversation with the gentleman to whom it was sent, was admitted in evidence. The defendant alleges it as an error, but we think it was admissible. It was proper evidence as tending to prove the character of the house. There being evidence showing a conspiracy, and that she was one of the conspirators.

The prosecution, upon the cross-examination of Hampton, the defendant, was permitted to show that he had paid seven hundred dollars to a woman named Fanny Daven-

port, in addition to paying the woman Field, who is named in the indictment, some four hundred dollars, and also that he sent several hundred dollars to have a prostitute come from San Francisco to Salt Lake for the purpose of "detecting some one." All this testimony was proper. There was testimony indicating that the defendant entered into the conspiracy for the purpose of inveigling prominent men, not Mormons, into a disreputable house, upon some excuse or another, for the purpose of blackening their characters, by way of reprisal for the punishment of those who have been convicted of violating the Edmunds law. On the other hand, the defendant, upon his direct examination, placed his actions upon the high ground of detecting and punishing sexual crimes. The testimony, therefore, which was brought out upon his cross-examination was proper. The prosecution had a right to examine him fully as to his motives, and to draw out fully his conduct, as tending to throw light upon his good faith in the transaction.

It is insisted that the indictment is insufficient. It is claimed that the facts stated do not constitute the offense sought to be charged, or any offense against the defendant. The indictment charged that the defendant entered into a conspiracy with one Mrs. S. J. Field to keep a house of ill-fame, and that between the twentieth day of June, 1885, and the first day of October, 1885, the said Field, in pursuance of said conspiracy, did keep such house. The indictment seems to us to meet the requirements of our statute: Laws 1878, sec. 58. The indictment charges a corrupt agreement to do a criminal act, and that in pursuance of said agreement the criminal act was done.

There is no error in the record, and the judgment of the court below must be affirmed.

ZANE, C. J., and BOREMAN, J., concurred.